IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICK L. BUMPUS, | ) | |
| *a/k/a/ Zakiya 'Kondo' Miwinyi*, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:19-cv-01081 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| ROBERT HOWARD, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

## **MEMORANDUM OPINION**

Plaintiff Patrick L. Bumpus, a state prisoner at the Trousdale Turner Correctional Center ("TTCC") in Hartsville, Tennessee, filed a *pro se* complaint under 42 U.S.C. § 1983 against TTCC Assistant Warden James Deal, Chief of Security Robert Howard, Dr. Terence Leveck, Nurse Johnson, and medical provider Walter. (Doc. No. 1). Plaintiff also filed an application to proceed in this court without prepaying fees and costs (Doc. Nos. 2, 6), and a motion to stay this action for three months (Doc. No. 7). The case is before the Court for a ruling on the application and pending motion, and an initial review of the Complaint pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e.

### **I. APPLICATION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS***

The Court may authorize a prisoner to file a civil suit without prepaying the filing fee. 28 U.S.C. § 1915(a). Plaintiff's application to proceed as a pauper and certified trust account statement reflect that he cannot pay the full filing fee in advance. (*See* Doc. No. 6).[1] Accordingly,

---

[1] Plaintiff originally filed an incomplete application to proceed *in forma pauperis* (Doc. No. 2), but refiled a complete application (Doc. No. 6) pursuant to an Order of the Court (Doc. No. 5).

the application will be granted and the $350.00 filing fee will be assessed as directed in the accompanying Order. 28 U.S.C. § 1915(b)(1).

## II. INITIAL REVIEW OF THE COMPLAINT

Under the PLRA, the court must review and dismiss any prisoner complaint filed *in forma pauperis* if it is frivolous or malicious, fails to state a claim, or seeks monetary relief from an immune defendant. 28 U.S.C. §§ 1915(e)(2).

A. <u>STANDARD OF REVIEW</u>

To determine whether a complaint "fails to state a claim on which relief may be granted" under the PLRA's screening requirements, the court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). The court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true unless they are entirely without credibility. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)). An assumption of truth does not extend to legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The court determines whether those factual allegations "plausibly suggest an entitlement to relief," *Williams*, 631 F.3d at 383 (quoting *Iqbal*, 556 U.S. at 681 (2009)), that rises "above the speculative level," *Twombly*, 550 U.S. at 555.

"*Pro se* complaints are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed." *Williams*, 631 F.3d at 383; *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)). Even under this lenient standard, however, *pro se* plaintiffs must meet basic pleading requirements and are not

exempted from the requirements of the Federal Rules of Civil Procedure. *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004); *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989); *see also Young Bok Song v. Gipson*, 423 F. App'x 506, 510 (6th Cir. 2011) (explaining the role of the courts is not "to ferret out the strongest cause of action on behalf of *pro se* litigants" or to "advis[e] litigants as to what legal theories they should pursue").

## B.  FACTUAL BACKGROUND

The liberally-construed Complaint alleges the following facts that the Court must accept as true for purposes of initial review. While at TTCC, Plaintiff sought medical care for a skin rash on his left arm. (Doc. No. 1-1 at 5). Medical provider Walter prescribed him a therapeutic shampoo. (*Id.*) The rash spread up Plaintiff's harm and to his neck, and the skin turned red and itchy. (*Id.*) Walter then prescribed Plaintiff Hydrocrostine and A&D ointment. (*Id.*) The rash then spread to Plaintiff's genitals. (*Id.*) Walter prescribed castor oil and Predisone. (*Id.*) Soon Plaintiff's skin looked "as if [he] had been burnt by fire," and he was rushed to the medical unit. (*Id.*) Dr. Leveck gave Plaintiff a steroid injection and Walter gave Plaintiff more Prednisone. (*Id.* at 5-6).

Nonetheless, Plaintiff's skin condition continued to worsen. His entire body became red, burned, and his skin was severely dry and "constantly falling off." (*Id.* at 6). Dr. Leveck, Walter, and Nurse Johnson gave Plaintiff more steroids without any diagnosis. (*Id.*) The Prednisone worsened Plaintiff's condition, and his skin turned dark red. (*Id.*) Plaintiff's condition became so severe that the "excruciating" itching prevented him from engaging in normal day-to-day functions like working and sleeping. (*Id.*) Plaintiff had to constantly change his sheets due to "dead skin . . . shed[ding] off [his] entire body." (*Id.*) Plaintiff requested a consultation with an outside specialist, but Dr. Leveck denied the request. (*Id.*) When Plaintiff asked Dr. Leveck for a diagnosis, Dr. Leveck admitted that he did not know what condition Plaintiff had or how to properly treat him.

3

(*Id.*) When Plaintiff told the Warden that he was being treated without a diagnosis, the Warden "laughed in [Plaintiff's] face." (*Id.*) Plaintiff also received no response from letters to Tennessee Department of Correction ("TDOC") Commissioner Tony Parker.[2] (*Id.*)

On July 10, 2019, Plaintiff returned to TTCC from another facility after a court date. (*Id.* at 2). During the intake process, other inmates were given cell assignments. (*Id.*) However, Chief of Security Robert Howard made Plaintiff sleep in a cell in the intake area that was very cold, bug-infested, and "nasty" with blood and other biohazard materials smeared on the walls. (*Id.*) The cell also had no running water. (*Id.*) Plaintiff voiced his concerns to Howard, but Howard ignored them. (*Id.*) The next day, Howard assigned Plaintiff to the only cell in the D-unit with no running water. (*Id.*) As a result, Plaintiff had to hold his bodily waste and restrict hygienic needs, and he could not perform religious obligations that required the use of water.[3] (*Id.*) After one week, the pipes were repaired and water was restored to the cell. (*Id.* at 3). By this time, Plaintiff had a bloated stomach and an aggravated skin condition. (*Id.*) He was rushed to medical and given another steroid shot. (*Id.*) However, this did not heal the outer layer of Plaintiff's skin, which looked infected. (*Id.*) Plaintiff filed a grievance about these circumstances, but he never received a response. (*Id.*)

Plaintiff alleges that Nurse Johnson refused him medical treatment for his skin condition multiple times in July and August of 2019. (*Id.*) On October 13, 2019, Plaintiff requested emergency medical treatment for his skin condition. (*Id.* at 3-4). His skin was "red, irritated, blistered, itchy[, and] fluids were running from open cut wounds," which Plaintiff alleges was caused in some degree by the steroids he had been given. (*Id.*) The skin condition was "very

---

[2] Neither TTCC Warden Washburn nor TDOC Commissioner Parker are Defendants in this action.

[3] Bumpus is a Sunni Muslim. (Doc. No. 1-1 at 2).

4

noticeable." (*Id*. at 4). However, Nurse Johnson refused to admit Plaintiff to medical or provide any medical services. (*Id*. at 3). After Plaintiff complained, Chief Howard also denied him access to medical services. (*Id*.) Plaintiff's skin was so irritated that he subsequently "passed out" from the itching and scratching. (*Id*. at 4). A TTCC officer notified Nurse Johnson that Plaintiff was having a severe allergic reaction and needed immediate treatment. (*Id*.) Nurse Johnson and Chief Howard came on the radio and instructed the officer to take Plaintiff back to his assigned unit because he would not be seen by medical or receive any treatment. (*Id*.) The officer repeated his analysis of Plaintiff over the radio, but Johnson and Howard repeated their instructions to take Plaintiff back to his unit. (*Id*.) Other prisoners became frustrated at pod Sergeant Cannon for denying Plaintiff treatment. (*Id*.) Cannon stated, "I know he needs emergency medical, but I can't send him to medical because Lieutenant Crensan, Chief Robert Howard, and Nurse Johnson [are] refusing him medical treatment."[4]

The next morning, October 14, 2019, Plaintiff presented himself to TTCC medical during diabetic call. (*Id*.) Upon seeing Plaintiff's condition, Nurse Moore immediately admitted Plaintiff. (*Id*.) Plaintiff was rushed into the infirmary and given medicine by Dr. Elouho and Nurse Moore, who stated that the condition was severe due to lack of treatment on the previous day. Plaintiff could not walk for several days due to the strength of the steroids. (*Id*. at 4-5). Dr. Leveck confessed to Plaintiff that his skin condition "had become ten times worse" due to the denial of treatment. (*Id*. at 5).

On October 24, 2019, Plaintiff was sent for a consultation with an outside dermatologist after pressure from his family members. (*Id*. at 7). The dermatologist prescribed several hygienic products, and made an order for Dr. Leveck to follow. (*Id*.) Plaintiff told Dr. Leveck about the

---

[4] Neither Cannon nor Crensan are Defendants in this action.

dermatologist's order, but Dr. Leveck stated, "I'm not going to prescribe you anything that the dermatologist has recommended you, because CCA won't allow me to."[5] (*Id.*) Dr. Leveck added, "I'm sorry, but if this is the stuff that you need to heal up and get better, you're just going to have to suffer while you're here in [until] you get out and be able to get better treatment for yourself." (*Id.*) Dr. Leveck also refused to allow Plaintiff's family to order the prescriptions, stating "CCA [won't] allow your family to order through the pharmacy." (*Id.*)

On October 25, 2019, Plaintiff notified Dr. Leveck that the skin symptoms were becoming worse, "like last time." (*Id.*) Dr. Leveck stated, "I cannot fully treat you because CCA has a strict limit on medical supplies." (*Id.*) On October 30, 2019, a TTCC officer escorted Plaintiff to the medical unit due to "fluids leaking from [his back] and private area" and his skin being severely "dry, itchy, and irritated." (*Id.*) Plaintiff's condition worsened the next day, and on November 1, 2019, he had an allergic skin reaction in front of medical provider Davis. (*Id.*) However, Davis refused Plaintiff treatment due to the instructions of Nurse Johnson.[6] (*Id.* at 8).

On November 4, 2019, medical provider Walter told Plaintiff that the steroid injections had made Plaintiff's condition worse. (*Id.* at 9). Nurse Moore also stated that she tried to tell Dr. Leveck and Nurse Johnson to stop giving Plaintiff steroids, but they "waved her off." (*Id.*) Nurse Moore said that she did not believe Plaintiff's medical file accurately documented the cause of his condition. (*Id.*) Plaintiff wrote grievances about these medical issues, but the grievance committee sent paperwork back stating that "a diagnosis by medical professionals" was not a grievable matter.

---

[5] "CCA" is a common abbreviation for Corrections Corporation of America, which is the former corporate name of CoreCivic, the private company that operates the TTCC under contract with TDOC. *See* https://www.tn.gov/correction/sp/state-prison-list/trousdale-turner-correctional-center.html (explaining that "Trousdale Turner Correctional Center is a medium security facility managed by CoreCivic, a private corrections management firm")

[6] Davis is not a Defendant in this action.

(*Id*. at 8, 9). On November 5, 2019, the TTCC mail room denied Plaintiff medical supplies sent by his family. (*Id*. at 9). On November 8, 2019, Plaintiff again went to sick call about his skin condition, and medical provider Walter told Plaintiff there was "nothing I can do for you," and threatened him with segregation if he kept seeking treatment. (*Id*.)

That same day—November 8—Plaintiff received all his legal, personal, and media mail back from the mail room despite it having been approved to be sent out. (*Id*.) When the unit counselor called the mail room clerk to ask why this happened, the clerk stated that, "Assistant Warden James deal has come out with a new policy as of November 1, 2019, which means no legal mail or media mail will be sent out unless you have the money to pay for postage on your account." (*Id*.) As a result, indigent inmates at TTCC, such as Plaintiff, cannot send out legal mail. (*Id*. at 8-9). Plaintiff alleges that this policy is restricting him from "seeking help in [court] for an address of grievances, contacting the media, corresponding with attorneys, and so forth." (*Id*.) Plaintiff had "several things pending in [court]," and he had "several legal deadlines that [he] could not meet." (*Id*.) Plaintiff further alleges that he will never be able to utilize the mail under this policy because the State is garnishing his funds and he is always indigent. (*Id*.) Plaintiff believes that his mail is being restricted because Assistant Warden Deal does not want Plaintiff's concerns to be heard outside of TTCC. (*Id*.)

Plaintiff sues Assistant Warden Deal, Chief Howard, Dr. Leveck, Nurse Johnson, and medical provider Walter in their individual and official capacities. (Doc. No. 1 at 2-4). He brings claims under § 1983 for violations of the First, Eighth, and Fourteenth Amendments. (*Id*. at 3; Doc. No. 1-2). He seeks injunctive relief, compensatory damages, and punitive damages. (Doc. No. 1-3).

7

C.  <u>ANALYSIS</u>

Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law.[7] *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).

Plaintiff sues Defendants in both their individual and official capacities. "[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Here, the individual Defendants represent Core Civic, which is "the private entity contracted to manage [the] TTCC." *Shallenberger v. CoreCivic - Trousdale Turner Corr. Ctr.*, No. 3:19-cv-00900, 2020 WL 869984, at *3 & n.1 (M.D. Tenn. Feb 21, 2020) (citing *Plemons v. CoreCivic Admin. Headquarters*, No. 3:18-cv-00498, 2018 WL 4094816, at *3 & n.1 (M.D. Tenn. Aug. 28, 2018)). Thus, Plaintiff's official-capacity claims against the individual Defendants are effectively claims against Core Civic.

Because Core Civic is "a private corporation that performs the traditional state function of operating a prison," *Gennoe v. Washburn*, Case No. 3:19-cv-00478, 2019 WL 5693929, at *5 (M.D. Tenn. Nov. 4, 2019) (citations omitted), it is subject to suit under Section 1983. *Thomas v.*

---

[7] To the extent that any of Plaintiff's claims are premised on the mishandling of his grievances or violation of TTCC policies, he fails to state a claim under Section 1983. *Hursey v. Anderson*, No. 16-1146, 2017 WL 3528206, at *2 (6th Cir. Mar. 31, 2017) (explaining that "a prisoner has no constitutional right to an effective prison grievance procedure"); *Crockett v. Davidson Cty. Sheriff's Dep't*, No. 3:19-cv-00545, 2019 WL 5592546, at *3 (M.D. Tenn. Oct. 30, 2019).

*Coble*, 55 F. App'x 748, 748 (6th Cir. 2003) (citing *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996)); *see also Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 736 (6th Cir. 2015) (citing *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014)). The Sixth Circuit applies the standards for assessing municipal liability to claims against private corporations that operate prisons. *Thomas*, 55 F. App'x at 748-49; *Street*, 102 F.3d at 817-18; *Johnson v. Corr. Corp. of Am.*, 26 F. App'x 386, 388 (6th Cir. 2001). Thus, Core Civic "cannot be held liable under a theory of *respondeat superior*." *Street*, 102 F.3d at 818; *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011). To sustain an official-capacity claim, Plaintiff must allege: (1) that he suffered a constitutional violation; and (2) that a policy or custom of Core Civic directly caused the violation. *See Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (citing *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010)); *Braswell*, 419 F. App'x at 627.

    1. <u>First Amendment Access to the Courts</u>

Plaintiff first brings an access-to-courts claim against Assistant Warden Deal in his individual and official capacities. While Plaintiff characterizes these claims as brought under both the First and Fourteenth Amendments (*see* Doc. No. 1-2 at 3), they are properly analyzed under the First Amendment. *See Sharp v. Kelsey*, 918 F. Supp. 1115, 1121 (W.D. Mich. 1996) ("[T]he Fourteenth Amendment does not apply where there is a more specific constitutional provision available.") (citing *Albright v. Oliver*, 510 U.S. 266 (1994); *Graham v. Connor*, 490 U.S. 386 (1989)).

Prisoners have a well-settled First Amendment right of access to the courts. *Singer v. Price*, Case No. 3:16-cv-02621, 2017 WL 413853, at *4 (M.D. Tenn. Jan. 31, 2017) (citing *Bounds v. Smith*, 430 U.S. 817, 821-823 (1977)); *see also Hall v. Callahan*, 727 F.3d 450, 456 (6th Cir. 2013) (noting that access to the courts is a fundamental right). This right guarantees that prisoners have

"a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds*, 430 U.S. at 825. To ensure the meaningful exercise of this right, prison officials have an affirmative obligation to, among other things, provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Bounds*, 430 U.S. at 824-25. Furthermore, officials are prohibited from actively interfering with inmates' attempts to prepare legal documents, *Johnson v. Avery*, 393 U.S. 483, 484, 489-90 (1969), or file them. *See, e.g.*, *Dorn v. Lafler*, 601 F.3d 439, 445 (6th Cir. 2010) (explaining that "prisons have an obligation to timely mail court documents when prisoners have been diligent and punctual in submitting them to prison officials"), *abrogated on other grounds by Harrington v. Richter*, 562 U.S. 86 (2011); *Ex Parte Hull*, 312 U.S. 546, 547-49 (1941). Meaningful access to the courts varies with the circumstances, and prison officials are accorded discretion in determining how that right is to be administered. *Bounds*, 430 U.S. at 830-31.

However, in order to state a colorable claim for interference with access to the courts, a plaintiff must plead both a violation of the right and "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Because the right of access is "ancillary to [a lost] underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court," *Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019), "[a]n inmate who claims his access to the courts was denied fails to state a claim without any showing of prejudice to his litigation." *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996). Thus, a plaintiff must plead both a violation and "that the defendant[ ] ha[s] scuttled his pursuit of a 'nonfrivolous, arguable' claim." *Sampson*, 917 F.3d at 881 (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)); *see also Loyde v. Wilkes*, No. 3:16-cv-00758, 2016 WL 3058484, at *6 (M.D. Tenn. May 31, 2016) (a prisoner must also allege "actual prejudice to pending or contemplated litigation") (quoting *Moore v. Chavez*, 36 F. App'x 169, 171 (6th Cir.

Case 3:19-cv-01081   Document 9   Filed 07/30/20   Page 10 of 24 PageID #: 85

2002)). Accordingly, the "underlying cause of action and its lost remedy" is an "element that must be described in the complaint." *Christopher*, 536 U.S. at 415-16 (citing *Lewis*, 518 U.S. at 353 & n.3). Furthermore, the injury must be specific prejudice, "[such as] the late filing of a court document or the dismissal of an otherwise meritorious claim," *Loyde*, 2016 WL 3058484, at *5 (quoting *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)), and the impacted claim must be either a "direct appeal[], habeas corpus application[], [or] civil rights" action. *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir 1999) (en banc); *see also Lewis*, 518 U.S. at 351.

The Complaint alleges that Assistant Warden Deal implemented a policy that restricted Plaintiff from "seeking help in [court] for an address of grievances, contacting the media, corresponding with attorneys, and so forth." (Doc. No. 1-1 at 8-9.) However, Plaintiff has failed to allege actual injury. Plaintiff alleges only that he has not been able to meet "several legal deadlines" for "several things pending in [court]." (*Id.*) Plaintiff does not provide factual matter on the nature of his legal claims, and he does not allege any adverse legal decisions stemming from missed deadlines. Accordingly, Plaintiff has failed to plead, as required, specific prejudice in an underlying cause of action seeking to vindicate constitutional rights. *See, e.g., Cody v. Slusher*, No. 17-3764, 2018 WL 3587003, at *2 (6th Cir. Mar. 8, 2018) (affirming dismissal of *pro se* prisoner access-to-courts claim on ground that plaintiff did not demonstrate arguably meritorious underlying claims); *Vick v. Core Civic*, 329 F.Supp.3d 426, 457 (M.D. Tenn. 2018) (dismissing access-to-courts claim because plaintiff failed to plead a denial or dismissal of underlying claim) (citing *Lewis*, 518 U.S. at 348-354); *Loyde*, 2016 WL 3058484, at *5 (dismissing access-to-courts claim because plaintiff failed to plead actual injury). Plaintiff's individual and official capacity First Amendment access-to-courts claims against Assistant Warden Deal will therefore be dismissed for failure to state a claim. However the dismissal of these claims will be without

prejudice, so that Plaintiff is not precluded from moving to re-assert the claims, if appropriate, supported by specific allegations of actual injury.

### 2. First Amendment Freedom of Speech

Plaintiff also brings freedom of speech claims against Assistant Warden Deal in his individual and official capacities. A prisoner has a First Amendment right to send mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). A restriction on this right is valid "only if it is reasonably related to legitimate penological interests." *Rodgers v. Hawley*, 14 F. App'x 403, 408 (6th Cir. 2001) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). For example, interfering with a prisoner's right to send mail simply because the letter contains legal information bears no relation to a legitimate penological interest. *Id.* (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1431-32 (7th Cir. 1996)).

The Complaint alleges that Assistant Warden Deal implemented a blanket policy that – at a minimum – prevented indigent inmates, including Plaintiff, from corresponding with courts, the media, and attorneys. Liberally construing the Complaint, the Court infers that Plaintiff contends this is a Core Civic policy, and it is not reasonably related to any legitimate penological interest. The Court finds that, at this early juncture, these allegations state a colorable First Amendment freedom of speech claim against Assistant Warden Deal in his individual and official capacities. These claims will be allowed to proceed for further development.

### 3. First Amendment Retaliation

Liberally construed, the Complaint also brings a First Amendment retaliation claim against Assistant Warden Deal in his individual and official capacities. To advance this claim, Plaintiff must plausibly allege "that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected

12

conduct.'" *Hill*, 630 F.3d at 472 (quoting *Thaddeus-X*, 175 F.3d at 394, 398); *Strader v. Cumberland Cty.*, No. 2:19-cv-00045, 2020 WL 291383, at *10 (M.D. Tenn. Jan. 21, 2020). In *Hill*, the Sixth Circuit reversed the district court's dismissal of a First Amendment retaliation claim on initial review, emphasizing that the essential elements of such a claim are not overly difficult to establish, "especially in light of the 'indulgent treatment' that '[c]ourts are instructed to give . . . to the 'inartfully pleaded' allegations of *pro se* prison litigants." *Hill*, 630 F.3d at 471 (quoting *Pasley v. Conerly*, 345 F. App'x 981, 986 (6th Cir. 2009)). The Court of Appeals indicated that, where the facts alleged in a prisoner's complaint are sufficient to support these elements, the claim should go forward even if the inmate "fails to explicitly state" that he is making a First Amendment retaliation claim or does not "make an effective argument for that claim in his . . . complaint." *Id.* (citing *Pasley*, 345 F. App'x at 986).

Here, Plaintiff alleges that Assistant Warden Deal implemented a blanket policy restricting indigent inmates, including Plaintiff, from sending mail to courts, media, and attorneys, after Plaintiff had filed numerous grievances concerning medical treatment, because Deal did not want Plaintiff's concerns to be heard outside of TTCC. Although Plaintiff does not use the term "retaliation," the Court finds that Plaintiff's allegations are indeed sufficient to state a nonfrivolous claim of First Amendment retaliation. First, Plaintiff's efforts to seek medical care and complaints about the lack of medical care "are activities protected by the Constitution." *Lumbard v. Lillywhite*, --- F. App'x ---, No. 18-2335, 2020 WL 2569357, at *6 (6th Cir. May 21, 2020) (citing *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996)). Second, although "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse," *Thaddeus-X*, 175 F.3d at 398, a blanket preclusion against certain prisoners using the mail to contact people or entities who can assist them

13

"would likely have a strong deterrent effect" on those prisoner's protected activities. *See Lumbard*, 2020 WL 2569357, at *6 (citing *Thaddeus-X*, 175 F.3d at 398 (adverse action "threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed")). Finally, Plaintiff has sufficiently alleged that these punitive actions were motivated by Deal's desire to conceal Plaintiff's complaints about inadequate medical care from outsiders. *See id.* (explaining that a retaliation claim survives if a plaintiff "alleges facts that his protected activity was 'a motivating factor' behind the adverse action") (citing *Thaddeus-X*, 175 F.3d at 399); *Hill*, 630 F.3d at 475-76 (retaliatory motive can be supported by circumstantial evidence including "the disparate treatment of similarly situated individuals or the temporal proximity between the prisoner's protected conduct and the official's adverse action") (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 525-26, (6th Cir. 2010)). Finally, the Court again construes the Complaint to allege that Plaintiff contends Deal implemented a Core Civic policy. Accordingly, at this early stage of the case, the Court concludes Plaintiff states a colorable First Amendment retaliation claim against Assistant Warden Deal in his individual and official capacities.

4. <u>First Amendment Free Exercise of Religion</u>

Next, Plaintiff brings a free exercise of religion claim against Chief of Security Howard in his individual and official capacities. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. CONST. amend. I. Prisoners retain the right to free exercise of their religion, and they must therefore be provided "reasonable opportunities" to practice their religion. *Hudson*, 468 U.S. at 523; *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985). However, a prisoner's right to exercise his religious beliefs may be subjected to reasonable restrictions and limitations reasonably related to legitimate

14

penological interests. *Vick*, 329 F. Supp. 3d at 452-53 (citing *Bell v. Wolfish*, 441 U.S. 520, 549-51 (1979); *Pollack v. Marshall*, 845 F.2d 656, 658-60 (6th Cir.1988)). The First Amendment does not require that prison officials provide inmates with the best possible means of exercising their religious beliefs, nor does it require that general prison policies and concerns become subordinate to the religious desires of any particular prisoner; the internal administration of a correctional facility is a function left to the discretion of prison administrators. *Id*. (citations omitted).

Liberally construing the Complaint, Plaintiff alleges that Howard denied him the ability to perform Sunni Muslim religious obligations requiring the use of water by placing him in two cells (intake and then D-unit) without running water for over one week. The Complaint further alleges that Howard was aware of Plaintiff's concerns but ignored them. The Complaint does not indicate that, without the ability to use water, Plaintiff had an alternative means of exercising his particular religious beliefs. *See Vick*, 329 F. Supp. 3d. at 453. For example, the Complaint does not include allegations suggesting that the Plaintiff may complete the same Sunni Muslim rituals without water. Based upon the allegations that were made in the Complaint, which the Court must accept as true, the Court concludes that Plaintiff has stated a non-frivolous First Amendment free exercise of religion claim for purposes of the required PLRA screening.[8] *See Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) ("Denying a Muslim inmate the opportunity to partake in Eid would substantially burden his free exercise rights, so Maye has alleged a deprivation of his rights under the Free Exercise Clause."); *Vick*, 329 F. Supp. 3d at 453 (allowing claim that prisoner was denied ability to partake in religious services while in certain housing to proceed for further development).

---

[8] The Complaint likely also states a claim for violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"). However, money damages are not available against state prison officials under RLUIPA, *Haight v. Thompson*, 763 F.3d 554, 570 (6th Cir. 2014), and Plaintiff does not seek injunctive relief concerning this deprivation. Accordingly, there is no basis for a RLUIPA claim to proceed for further development.

15

This individual-capacity claim against Chief Howard will therefore be allowed to advance beyond initial review. The official-capacity claim, however, will be dismissed because Plaintiff fails to allege that any Core Civic policy or custom caused this violation.

    5. Eighth Amendment Deliberate Indifference to Serious Medical Need

Next, Plaintiff brings individual and official-capacity claims against Defendants Howard, Leveck, Johnson, and Walter concerning inadequate medical treatment at TTCC. While Plaintiff characterizes these claims as brought under the both Eighth and Fourteenth Amendments (*see* Doc. No. 1-2 at 1-2), they are properly analyzed under the Eighth Amendment. *Sharp*, 918 F. Supp. at 1121 (citations omitted). "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' that is violative of the Constitution." *Darrah v. Krisher*, 865 F.3d 361, 367 (6th Cir. 2017) (quoting *Estelle*, 429 U.S. at 104, 105). "[A] prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs," *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle*, 429 U.S. at 104), and the prisoner's health suffered as a consequence. *See Thaddeus-X*, 175 F.3d at 401.

    "A constitutional claim for deliberate indifference contains both an objective and a subjective component. The objective component requires a plaintiff to show the existence of a 'sufficiently serious' medical need." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013). "[W]hen an inmate had a medical need diagnosed by a physician as mandating treatment, the plaintiff can establish the objective component by showing that the prison

16

failed to provide treatment, or that it provided treatment so cursory as to amount to no treatment at all." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citations and internal quotation marks omitted). "But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

For the subjective component, a plaintiff must allege that an official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[e]w the inference." *Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 837). "[N]egligence or negligent medical treatment are not actionable theories of liability under 42 U.S.C. § 1983." *Boldon v. Claiborne Cty. Det. Ctr.*, No. 3:16-CV-441-TWP-HBG, 2017 WL 4158612, at *6 (E.D. Tenn. Sept. 19, 2017) (citing *Daniels v. Williams*, 474 U.S. 327, 328-331 (1986)). A prisoner's difference of opinion regarding diagnosis or treatment also does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 107.

First, the Court finds that Plaintiff has satisfied the objective component. He alleges that he suffered from a full-body condition so severe that his skin looked as if it "had been burnt by fire"; was constantly "shed[ding] off [his] entire body"; and caused "excruciating" discomfort and itching that prevented him from engaging in normal day-to-day functions like working and sleeping. (Doc. No. 1-1 at 6.) On one occasion, the skin irritation became so severe that it caused Plaintiff to pass out, and on several other occasions Plaintiff was rushed to TTCC's medical infirmary on an emergency basis. Generally, simple rashes do not rise to the level of an objectively serious medical need. *See Lee v. Hatcher*, Case No. 3:16-cv-02590, 2016 WL 5467948, at *3

(M.D. Tenn. Sept. 29, 2016) (citing *Prather v. Corr. Care Sols.*, No. 3:16-CV-P60-JHM, 2016 WL 2903288, at *4 (W.D. Ky. May 18, 2016)). However, in this instance Plaintiff alleges not an inconsequential rash, but rather a severe, full-body skin condition that had a visible and significant impact on his overall health and well-being. Accordingly, the Court finds, for purposes of PLRA initial review, that Plaintiff has alleged a serious medical need for purposes of the objective component .

The Complaint also alleges that Defendants Howard and Johnson denied Plaintiff access to medical care for this condition from July to mid-October of 2019, despite emergency developments and the express requests of other TTCC employees. Plaintiff also alleges that Dr. Leveck, Nurse Johnson, and medical provider Walter provided certain grossly inadequate care before or after this period of denial. According to the Complaint, Dr. Leveck admitted that he did not know what condition Plaintiff had or how to properly treat him, yet refused Plaintiff's request to see a specialist for a lengthy period of time. Plaintiff alleges that on the occasions he did receive treatment from these three Defendants for his serious condition, it was either wholly inadequate or visibly worsened his condition. Moreover, after Plaintiff was finally allowed to see an outside specialist, Dr. Leveck refused to follow the specialists orders, telling Plaintiff he would "just . . . have to suffer while you're here in [until] you get out and be able to get better treatment for yourself." (*Id*. at 7.) In sum, at this early stage of the case, the Complaint is sufficient to allege that the Defendants to this claim either "failed to provide treatment, or . . . provided treatment so cursory as to amount to no treatment at all," *Rhinehart*, 894 F.3d at 737, or provided care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*. Finally, Plaintiff alleges he has suffered detrimental effects from the Defendants' actions, including exacerbation of existing symptoms, pain, passing out, extreme

discomfort, and disruption to basic life functions. For the purpose of initial review, this is sufficient to satisfy the objective standard insofar as it requires an alleged "fail[ure] to provide treatment, or [provision of] treatment so cursory as to amount to no treatment at all." *Rhinehart*, 894 F.3d at 737.

Second, the liberally-construed Complaint satisfies the subjective component by alleging these four Defendants were aware of Plaintiff's serious medical needs and disregarded them. Specifically, Plaintiff alleges that he presented to these Defendants on multiple occasions with the same serious medical complaints, and these Defendants were aware of emergency situations caused by Plaintiff's condition. Plaintiff alleges that, despite this knowledge, these Defendants deliberately denied him adequate care. This is sufficient, at this early stage, to allege that the Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[e]w the inference." *Winkler*, 893 F.3d at 891 (quoting *Farmer*, 511 U.S. at 837). Accordingly, for purposes of initial review, the Court finds that Plaintiff has stated colorable Eighth Amendment deliberate-indifference claims against Defendants Howard, Leveck, Johnson, and Walter in their individual capacities.

Concerning the official-capacity claims, the Complaint alleges Dr. Leveck refused to implement the outside specialist's orders and stated, "CCA won't allow me to." (Doc. No. 1-1 at 7.) The Complaint further alleges that Dr. Leveck acknowledged Plaintiff's condition was worsening, but stated, "I cannot fully treat you because CCA has a strict limit on medical supplies." (*Id.*) Liberally construing the Complaint in Plaintiff's favor, the Court infers that Plaintiff alleges that Core Civic has a policy or custom of denying necessary medical treatment to inmates, at least in part due to limits on the cost of medical supplies. This is sufficient, at this point, to pursue a deliberate-indifference claim against Core Civic. Accordingly, the official-capacity claim against

Dr. Leveck will proceed for further development. Plaintiff's official-capacity claims against the other Defendants will be dismissed as redundant.

To be clear, at this time Plaintiff is not confronted by a motion to dismiss. Instead, he has a "lower burden . . . to overcome" at the (current) PLRA screening stage. *Vick*, 329 F. Supp. 3d at 446. The Court finds merely that, for now, these claims survive the required screening under the PLRA.

6. <u>Eighth Amendment Conditions of Confinement</u>

Plaintiff also brings an Eighth Amendment conditions-of- confinement claim against Chief Howard based on the allegations that Howard placed Plaintiff in two cells without running water for over one week. The Constitution does not protect a prisoner from unpleasant prison experiences. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). Nor does it mandate comfortable conditions of confinement. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). However, the Eighth Amendment does impose an obligation to provide prisoners with reasonably adequate food, clothing, shelter, sanitation, recreation, and medical care to guarantee prisoner safety. *Farmer*, 511 U.S. at 832; *Grubbs v. Bradley*, 552 F. Supp. 1052, 1119-24 (M.D. Tenn. 1982). The failure to provide such necessities is a violation of an inmate's right to be free from cruel and unusual punishment. *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir. 1984). A claim that prison officials have failed to meet this obligation requires: (1) a "sufficiently serious" deprivation that falls below a "minimal civilized measure of life's necessities," and (2) "deliberate indifference to inmate health or safety" on the part of a prison official. *Hamby v. Gentry*, No. 3:12-CV-01296, 2013 WL 3315494, at *5 (M.D. Tenn. July 1, 2013) (quoting *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006)). Without an allegation of injury or harm, a plaintiff does not state a viable Eighth

Amendment conditions-of-confinement claim. *Chaffins v. Lindamood*, No. 1:17-cv-00061, 2017 WL 3130558, at *3 (M.D. Tenn. July 24, 2017).

Plaintiff alleges that Chief Howard placed him in two cells (successively) without running water for eight consecutive days. (*See* Doc. No. 1-1 at 2-3 (alleging placement in an intake cell without water for one day and a cell in D-unit without water for one week)). Liberally construed, the Complaint also alleges that Plaintiff did not have access to other water facilities during part or all of this time. (*See id.* at 3 (alleging that Plaintiff's "stomach was bloated from not being able to use the bathroom," his skin condition worsened, and he was unable to perform religious rituals requiring water). Especially given the alleged duration of the deprivation, these allegations are sufficient to state a colorable individual-capacity conditions-of-confinement claim against Chief Howard. *Compare Grubbs*, 552 F. Supp. at 1131 (confinement for more than one week without hot water amounted to cruel and unusual punishment), and *Perry v. Knowles*, No. 4:12-cv-3, 2013 WL 4046319, at *4 (E.D. Tenn. Aug. 8, 2013) (to state a conditions-of-confinement claim based on alleged lack of running water in a cell, a plaintiff must also allege that "he was denied use of [other] facilities in the jail with running water and a working commode"), *with Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011) (denial of running water for less than one week is not actionable). This claim will therefore be allowed to proceed for further development. The official-capacity claim against Chief Howard will be dismissed because Plaintiff fails to allege that any Core Civic policy or custom caused this violation.

7. Equal Protection Claim

Finally, Plaintiff claims that Chief Howard violated his Fourteenth Amendment right to equal protection by placing him in the substandard cells. (Doc. No. 1-2 at 1). The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its

21

jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This is "in essence 'a direction that all persons similarly situated should be treated alike.'" *Robinson v. Jackson*, 615 F. App'x 310, 314 (6th Cir. 2015) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Thus, the threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). A plaintiff must allege that the government treated him or her disparately as compared to "similarly situated persons." *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011); *see also Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) (explaining that an equal protection plaintiff must be similarly situated to his comparators "in all relevant respects"). However, "to establish an equal protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required." *Maye*, 915 F.3d at 1085 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977)); *Pleasant-Bey v. Tennessee*, No. 3:19-cv-00486, 2020 WL 707584, at *9 (M.D. Tenn. Feb. 12, 2020). Thus, a plaintiff may state an equal protection claim by plausibly alleging "that (1) he was treated disparately from similarly situated prisoners, and (2) the disparate treatment is the result of intentional and purposeful discrimination." *Davis v. Heyns*, No. 17-1268, 2017 WL 8231366, at *4 (6th Cir. Oct. 16, 2017) (quoting *Robinson*, 615 F. App'x at 314-15).

Here, Plaintiff alleges that he was treated differently than other prisoners who were placed in cells with running water. However, while Plaintiff identifies himself as a Sunni Muslim, he does not allege that Defendant Howard "intentionally discriminated against him because of his membership in that protected class." *McGaughy v. Johnson*, 63 F. App'x 177, 178 (6th Cir. 2003) (citing *Herron v. Harrison*, 203 F.3d 410, 417 (6th Cir. 2000)). Nor does Plaintiff allege that he is a member of any other protected class; notably, prisoners as a group are not members of a protected

class for equal protection purposes. *See Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997)

Nor does Plaintiff allege any other discriminatory intent or purpose sufficient to support an equal protection claim. Because Plaintiff has not sufficiently alleged a discriminatory intent or purpose, the individual and official capacity equal protection claims against Howard must be dismissed for failure to state a claim.

## IV. MOTION TO STAY

Plaintiff has moved the Court to stay this action for 90 days because TTCC is under lockdown due to Covid-19 and Plaintiff has unfortunately contracted the illness. (Doc. No. 7.) This request, which will not prejudice Defendants, will be granted in part. The case will remain active. However, the Court will allow Plaintiff 120 days, rather than the standard 30 days, to return the service packets in order to issue process.

## V. CONCLUSION

For the reasons explained above, Plaintiff's *in forma pauperis* application will be granted. The following colorable claims will be allowed to proceed: First Amendment freedom of speech and First Amendment retaliation claims against Defendant Deal in his individual and official capacities; First Amendment free exercise of religion claim against Defendant Howard in his individual capacity; Eighth Amendment deliberate-indifference claims against Defendants Howard, Johnson, Leveck, and Walter in their individual capacities, and against Defendant Leveck in his official capacity; and an Eighth Amendment conditions-of-confinement claim against Defendant Howard in his individual capacity.

All other claims will be dismissed. All dismissed claims will be dismissed with prejudice, except that Plaintiff's First Amendment access-to-courts claims against Defendant Deal in his individual and official capacities will be dismissed without prejudice.

Plaintiff will be allowed additional time (an extra 30 days, as noted above) to return the forthcoming service packets due to his medical status. This case will be referred to the Magistrate Judge for further proceedings.

An appropriate Order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE